3-10-0432, Julia A. Shane, appellant by Karen Kendall v. Barbara Wyman, appellee by Jackson County. Ms. Kendall? Thank you, Your Honor. If it please this Court and Counsel, my name is Karen Kendall, and I am here before this Court today on behalf of Julia Shane. This case culminated in a bench trial and an order by the trial court. It arose out of the execution of a quitclaim deed on March 15, 2005. For three months in November, December, and January 2004 and 2005, Julia Shane was in First Proctor Hospital and then a nursing home, recovering from a serious femur fracture which required surgery and traction. She had an eighth grade education. She was 93 at the time she executed this quitclaim deed. She was a farmer's wife who'd lost her husband quite early in 1978. She got out of the nursing home after this three months at the end of January. A mere six weeks later, she executed a quitclaim deed, giving all of her farmland, approximately 221 acres, to her daughter, Barbara Wyman. She lived with Barbara Wyman the entire time during that six weeks prior to the execution of that deed, and indeed was wholly dependent upon her. She was frail and depressed. There's no dispute about those things. In ruling following this bench trial, the trial judge made several serious errors which require reversal. Let me review briefly the trial judge's order with you before I proceed to discuss in detail the errors which require reversal. The judge found, based upon the evidence, that there was a fiduciary duty owed by Barbara Wyman, Julia Shane's daughter, to her mother, Julia Shane. The court found that Julia was very dependent upon Barbara and reposed great confidence and trust in her, and found, therefore, that a fiduciary duty existed, and because of the existence of the fiduciary duty, a presumption of undue influence arose. In the court's order, the court states that the burden shifted to Barbara to prove, by clear and convincing evidence, that that transaction in question was fair and equitable and did not result from undue influence. One of the minor errors that the court made in the order itself was finding factually that Julia had long held an intent to even the inheritances when the testimony the court heard was about Uncle Jerry Shane's death. Jerry Shane died in early January 2005. That can't have been a long-held intent, just as, by the way, in January 2005 did Julia Shane's sister, who was also in the same nursing home and who was also suffering from dementia like Julia. The court concluded in finding that Barbara had met her burden of showing, by clear and convincing evidence, that the transaction was fair and equitable, while observing at the same time that Barbara's conduct was not commendable and that Attorney Fuller could have done certain things differently. Nowhere in the trial court's order is there an acknowledgement that the court heard expert testimony in this case. Expert testimony by Dr. Shana Kurth, a board-certified neuropsychologist. May I interrupt you? Yes. The court's order doesn't suggest that Fuller could have done other things. Is it in the transcript? Oh, if it wasn't in that order, then it was in his oral ruling on the motion to reconsider. And I'm sorry if I misstated it, Your Honor. He did say that. He said it at the time he was denying the motion to reconsider. Okay. Sorry. Thank you. Nowhere does the court acknowledge or account for or even recognize the existence of Dr. Kurth's testimony. The defendant has agreed that Dr. Kurth was qualified to render the opinion she rendered. Dr. Kurth's testimony was extremely significant. She alone was qualified to determine whether, in fact, Julia Shane was competent to understand a complex financial transaction in 2005. And Dr. Kurth explained why a hairdresser, somebody at the card game, even a niece who stops in the nursing home to say, Hi, how are you, how are you doing, isn't the person that you look to, isn't, in fact, competent to make a complex psychological evaluation. Julia Shane, like all of us, have learned social phrases. We have what are called learned empty social phrases that we reach to when we're in a social setting. Well, that's what laypersons are reflecting when they say, and Julia seemed the same as she always did, Hi, how are you, how's the weather, how are things going? Vague, empty speech, over-learned answers in a social setting. What Dr. Kurth said is a better indication of how demented a person is or incompetent or their cognitive ability is how much help, how much care. And we know here that Julia was receiving care before she fractured her femur, spent three months in the hospital, and required full-time care. Let me just ask you, because I anticipate Mr. Rock is going to get up here and say, but the psychologist didn't see your client's mother until years after she executed that deed. What effect does that have on your opinion? If someone came and rendered a contrary opinion who was equally qualified, I think it might, you know, you'd have a conflict of opinions. Here, though, Dr. Kurth explained her methodology, her testing, and in fact she said, look, way back as early as eight years before 2005, as early as 1997, her medical records reflect the family's concern regarding her competency and her dementia. And I just want to mention, in terms of the importance of Dr. Kurth's testimony, one of the things- Was that at the time she executed the 97 one? I don't know if it was specifically at the time. One of the things the trial court mentions in the order is, well, look, she was competent to sign a power of attorney in 2004. And Dr. Kurth explained that what you have to look at is the complexity of the task. And she gave an example, signing a power of attorney is not a complicated decision, whereas deciding to give away all your income-producing assets is, in fact, a complex decision. Dr. Kurth also explained why a doctor, such as Dr. Cohn, who sees Julia for ten minutes for her rash, doesn't have a basis, hasn't done any neuropsychological testing, hasn't examined her records from that point to render a decision as to whether she's competent to make a complicated financial decision. I have a question about the background of all this, because we're dealing with estate planning issues and allegedly her intent was to equalize or to make things equal among her children. Am I correct? In some sense, well, you're getting into what we think is one of the fundamental errors that the trial court made, which is to treat this as if it were a will rather than an interference transaction, because the will of Jerry Shane is what allegedly caused this desire on the part of Julia to even things up. However, if you really are evening things up, what you would do is write a will on the other side, not divest yourself of all your income producing property. But wasn't the residue of all of her estate to go to Barbara? In a will? In a will. Yes. So would that farm ground devolve to Barbara anyway? Yes. And so what is this about? It's about the income that Julia, if that's a valid will, the income that Julia has not had during this period from 2005 on. If the deed was void, then that 2005 will presumably also be void, right? Those are the same months, aren't we? One was March, one was July. It could be, Your Honor. I think there's a different – well, first of all, I guess I should say that I don't think there's any – that issue isn't before the court at this time in this litigation. But the 97 will have the same distribution plan. But, Your Honor, what we're talking about – and I don't really recall specifically, so I can't tell you yes or no – but what we're talking about is not who should get Julia Shane's property after her death. That's what Attorney Potts said, and this actually brings us to the second error, second very significant error in the trial court's order, which is that he said that Julia Shane was thoroughly screened by Attorney Potts and Attorney Fuller. Attorney Potts was not even told that Julia had been diagnosed with dementia the year before. Yet he still called this a very dramatic gift for someone to give away 90% of their assets, their income-producing property, when? Who knows how long the person will live? Who knows what needs they will have when there's no way to care for those needs? And he also said another significant thing in his testimony. He said Julia Shane wanted to have that income from the farm ground during her lifetime. So then we get to Attorney Fuller. Attorney Fuller doesn't know that she's residing with Barbara Wyman when she executes the quitclaim deed. He doesn't know that she's been hospitalized for three months. He doesn't know that she's lost her sister. He doesn't know any of these things. But more significantly, he doesn't do something very, very important. He doesn't do what Attorney Potts wanted to do, which is prepare a personal care agreement. He doesn't even say, Julia, have you thought about what's going to happen to you if you have to go in a nursing home, if you need full-time care? Have you thought of the fact that you're giving yourself no income in the future? He didn't say any of these things. He didn't say, well, it's okay to execute this quitclaim deed, but why don't we reserve a life estate so you have that income? Counselor, you have two minutes. Thank you. Did Mr. Potts provide any legal advice or services? It's unclear. He did see Julia and— He consulted with her, but he didn't provide any documentation. He prepared a personal care agreement, but that was never signed. The only thing that ever happened in this chain of events was that the quitclaim deed was executed, and as of that time, Julia Shane had no more income from the property. And it was prepared by Attorney Fuller? Yes, it was prepared by Attorney Fuller, who had also represented Barbara Wyman. And did Barbara—I'm sorry, did Barbara Wyman then take Julia to Fuller after— Yes, after Trey Potts, yes. How can, on these facts, there be clear and convincing evidence that this transaction was fair and equitable? What did Julia Shane gain in this transaction? How was her future protected? We are, all of us, attorneys and counselors. She did not even receive the advice that she needed in order to understand the future consequences of an inter vivos transfer of all her income-producing property. This transaction could not, as a matter of law, have been fair and equitable to Julia Shane. And we ask that it be rescinded. What's our standard of review here? Sorry? What's our standard of review here? With respect to questions of law, it's de novo. With respect to questions of fact, it's manifestly in the evidence. We believe that the Court made errors both of fact and of law. Thank you. Mr. Rock. Thank you. May it please the Court, Counsel. My name is Jeffrey Rock. I represent Barbara Wyman in this matter. I want to address what Justice Lutton just asked because I think it's a fallacy to say that there's any question of law in this case. Clearly, there was a complaint that complained of undue influence. It didn't mention competency, and I'll get to that later. If you read the complaint of the plaintiff, it never talks about competency. It says, Barbara Wyman exercised undue influence. That is a question of fact. There is no question of law. Somehow, in the plaintiff's brief, it's manufactured that, well, because Judge Gordon made an offhand remark, well, Julia Shane was competent to execute a will or execute a deed, that somehow he didn't understand the difference and he was applying some different standard. I think if you look at the record, there's no claim that there was a legal issue underlying this. I think this is clearly simply a manifest way to the evidence. Judge Gordon is an experienced judge. He's the chief judge of the Tenth Circuit. He handles these cases all the time. And I think you can take some comfort in the fact that he put the sights on Barbara Wyman very early. At the end of the plaintiff's case, he said, look, I'm going to make you prove that this was a fair transaction because I'm going to find that there's a fiduciary duty. What sane person would give away all of their income-producing property during their lifetime unless they didn't need income, unless they just had cash in the bank, for example? Who's rational about that decision? Let me say one thing about the record. And it appears in the plaintiff's brief, it was argued before Judge Borton, there is no testimony that she doesn't get that income. There is no testimony that she doesn't have any money. That's what they alleged in the complaint, that you can search that record for anybody saying that Julia Sheen doesn't have assets and doesn't have that income. I looked again and again and again because at the trial, there was no testimony about that. Well, I'm going to get back to just a simple old question. You have two wills out there. You have a 97 will and you have an 05 will. Right. Is the testamentary plan the same in both wills? Yes. And the 97 says I'm giving everything to Barbara because my sons are well-to-do and she gets everything. The 2005 will occurred after the transfer was actually made and it gave everything to Barbara. It just doesn't talk about the land, Justice Holdridge, because it was already conveyed. Okay. Because the 05 will was made to adjust personal requests? Right. It was subsequent to the land transfer. She went in and executed another will and says everything goes to Barbara that's left. Well, which is what the 97 will said after the request, right? Correct. But the 97 will specifically gave her the land. The 97 will says everything goes to Barbara, including the land, nothing to my sons because they're well-to-do, not because of lack of affection. 2005 will, the land had already been transferred. She executed the 2005 will and says everything that I have left goes to Barbara. The effects are not the same effect, is it not? Correct. Right. Okay. Except for the fact that, one, is you're preserving arguably income to yourself until that death transfer. Right. Let me talk about the reasons, Justice. Before you do that, let me just answer this. If I'm trying to determine whether it's fair or equitable that this elderly person gets to have an income-producing asset, isn't part of the equation whether to determine, well, if you give that away, what do you have left to take care of yourself? I mean, isn't that part of the equation? How can you determine whether it's fair and equitable if you don't know? Well, two things. Plaintiff has a burden of showing that she doesn't have the assets, I believe. Didn't the burden, as soon as they found undue influence in a fiduciary relationship, didn't the burden shift to you or your client to show that it was fair and equitable? Fair and equitable. Now, I think that's a different thing from saying, okay, is that a wise estate planning move? You know, is it something that, you know, normally you would do? And, again, I want to come back. The question is undue influence. That's what the plaintiff pled. This case has bled out all over the place because Judge Borden didn't believe that she was unduly influenced. She had all kinds of reasons for transferring this property. Attorney Potts and Attorney Fuller both said she wanted to even the scales in the family. And Fuller said, Fuller represented her for years. He'd done wills back prior to 97 and said that was a longstanding belief of hers. There was testimony that Julia said, look, the women in the family never get anything out of these wills. And when Jerry Shane's will came out, Bob Potts said she was upset about that because she and Barbara had done a lot for some of these male farmers in the family and never gotten anything. And she was upset about that. Bob Potts said that. Now, he said she wasn't bitter. She wasn't obsessed. She was a nice lady. She knew what she was doing. Is the overlay of this whole thing, we have a Shea family, I mean, immediate relatives, cousins, et cetera, but that there's a desire to have the survivors of the Shea greater family end up fairly equally? I think the testimony fairly was that was Julia Shane's intent. Well, then why wouldn't she reserve a life estate? At least take care of herself while she's alive. You'd do that on death. Well, and again, Justice Schmidt, that assumes she doesn't get that income. And if you read Fuller's testimony at trial, he said, look, Chris Dutton, the power of attorney who brought this action, R. Wyman and Julia Shane sat in his office, and they agreed they were going to take care of her for the rest of her life, which has happened, and that she was going to give that land to Barbara. So it, you know, and I come back to, I want to just talk about that for a second. The problem here is Julia Shane can't testify because the power of attorney who sat in with Potts and sat in with Fuller while all this was going on didn't raise any objections. She waits over three years to file this action after she knows Julia Shane can't testify anymore. If you look at the record, Chris Dutton, in 2007, two years after this transfer, she's never raised an objection. She calls Dr. Cohen, the personal physician, and says, well, you know, Julia's getting nasty. She can't remember anything. She seems to be really out of it. And at that time, Cohen examines her and writes a note and says, I think she's no longer competent to handle her affairs. Then the lawsuit gets filed. You know, Julia Shane was never given the opportunity to come before the court and say, yeah, I was sick and tired of the men in the family getting everything. I wanted to give it to my only daughter who didn't get any farmland. And the testimony was that Julia Shane said, I want to give it to her now because I was afraid the boys were going to take it away from her. That's unrebutted testimony. If you look at what was going on, you know, she told even the power of attorney's daughter said, yeah, I remember grandma saying the boys are too greedy and that they've got enough. And that was recurrent throughout the whole thing. And again, I come back to the claim is undue influence. And it's kind of got out of its bounds in saying, okay, did she really did she really force Julia Shane to give her that land? You know, if you look at the brief that I filed, it, you know, natural affection, desire to give family something is sufficient consideration. And the fact that it may not be the smartest decision or the best decision doesn't mean it was caused by undue influence. And I think that's that's the key here. It's utter speculation to say, oh, well, you know, all of these reasons that everybody testified to that Julia told them, you know, why she wanted to do the land transfer then. You've got to throw all that out the window. Let me ask you this. At the time Julia executed the quick claim being she's living with Barbara, right? Right. And then that then she ended up not living with Barbara. Three years later. Where'd she go? She went to live with Chris Dutton at that point in time. So Barbara was no longer taken care of. Right. But I go back to Fuller's office where both Dutton and Wyman are sitting there with Julia Shane. And there was an agreement. Chet Fuller testified among the three of them that the two women, Christy Dutton and Barb Wyman, would take care of Julia. And the other thing I want to stress here, if you look at the facts of the case, Julia had lived by herself. She lived in a farmhouse out the country by herself. She fell. She broke her leg. She was in the hospital. I don't think for three months. I think more like a month. She was in the nursing home for about four or five weeks and she needed a place to go. She went to live with Barbara. So it wasn't that she was this poor, you know, institutionalized, disabled, you know, elderly woman. She was living on her own until she broke her leg. So this is not a situation where you've got somebody who's, you know, completely helpless. If you look at the evidence on the appellant side, they hire an expert four years later after Julia can't testify about what her intentions were, then try to bootstrap that expert into saying, well, Bob Potts was wrong in his evaluation. Chet Fuller was wrong in his evaluation. Brian Cohen, her personal physician, was wrong in his evaluation of her, and that that should trump everything. The other thing I just want to point out quickly, if you look at the lay testimony, and as you may have seen from the briefs, I had a big problem with the appellant's brief. They were supposed to give you the facts. They ignored six lay witnesses that testified that Judge Borden said some of these people were completely objective and that's who I relied on. And he said Potts and Fuller, he said, were unshakable in their testimony. Those are the words he used. They're in the transcript at the motion for rehearing. He said they were unshakable in their testimony about her desires and her competency to transfer that property. And I think that this court has to look at, you have objective witnesses. You had nieces. You had people she knew. You had people from the community that she played cards with come in and say, she seemed to be fine. And she kept beating the drum before this deed was done that she wanted that property to go to Barb. And she didn't want it taken from Barb, and she wanted to even the scales in the family. And I think it's, you know, the knee-jerk reaction is, oh, well, why not give it back? You know, let's give the property back. The reason you shouldn't do that, one, it's against the manifest way to the evidence in front of Judge Borden. But in this case, you had a woman who the testimony, I think, clearly shows wanted to do something with her property because of perceived injustices in the family, because of her only daughter. Various circumstances are in this record. She was deprived of the ability to come before Judge Borden and say, that's exactly what I wanted to do. I'll take two minutes. Are you saying that we're talking about property, but we're also talking about income from property? That seems to be really what's going on here in my grant underneath all of this. There's nothing in the record to suggest why it might be imprudent to forego that income. There's nothing to suggest that she didn't intend to give that income with the property. Are you saying that? There's nothing in the record about what her intent was with the income. Okay, okay. And she couldn't testify to anything at that point in time because the power of attorney who sat in on all of these meetings talked about the quitclaim deed, waited over three years when she knew Dr. Cohen was going to say, well, your grandmother now is not competent. And even Kurth testified when she saw her for the first time four years later, said she can't testify to anything at this point. She doesn't have any capacity to remember she's suffering from severe dementia now and can't testify. And why would you wait three years to do that? Is Julia still alive? Yes. Yeah. But she, you know, at a trial three-plus years after the transfer, she couldn't testify to anything. You know, I think Kurth's testimony is correct that she is in severe dementia now and can't testify. And I think this Court ought to take a look at why on earth would you wait three years to put aside this transfer and then claim poverty and not put any evidence of poverty. Well, again, I guess I'd argue about whose burden of proof it was to show it was fair. And I guess poverty would be a part of the equation of whether it was fair or not. Is there any evidence that either one of these lawyers advised her, at least advised her to reserve a life estate and that she turned that down? I don't believe so. But I think the evidence fairly shows she knew what a life estate was because part of the land she transferred, she had a life estate in. You know, there were two pieces of property that she owned outright, and there was a piece of property that was transferred in which she had a life estate. So she held a life estate in some of the property that was transferred. So, I mean, she understood. Well, I mean, she can't testify, but theoretically she knew what she had. So part of that 221 acres was held and the 221 was held in life estate? No, no. The 221 consisted of three tracts, as I recall. And one of the small tracts, Julia had a life estate in. Thank you. Thank you. Thank you, Mr. Ryan. Ms. Kendall? Thank you, Your Honor. My opponent has stood before this court and said that there is no evidence in this record regarding Julia Shane's financial situation. That's absolutely wrong. In Attorney Potts' sworn evidence deposition testimony, he states that she did not have much cash or other investments. Her income consisted of Social Security and income from the farm. That's his testimony. That is unrebutted. I think what he was saying was at the time of the trial, there was no evidence of what her income was, but perhaps other than Social Security. Well, Your Honor, one could infer that she didn't hit the lottery in the meantime. No, I'm just saying that was my understanding of what he was saying. There was no evidence as to her present income? Yeah, other than Social Security. However, the testimony as to her income at the time that she was contemplating this transaction was that it was Social Security and income from the farm. There's no evidence that it has changed in any way, except that now she doesn't have the income from the farm. Moreover, my opponent said that there's no evidence that she wanted the income from the farm. But Attorney Potts testified that, yes, she did want the income from the farm. Attorney Fuller said he just assumed her family would take care of her. I mean, he recognized that she wouldn't have any income either, but he didn't step up to the plate and provide the counseling that's required. And it's required more when someone suffers from dementia than when someone doesn't. Listening to my opponent tell this court today why this judgment should be affirmed, I hear, well, the trial judge was a good judge. I don't hear why this transaction was fair and equitable. Certainly there's no evidence, let alone clearing and convincing evidence that this transaction was fair and equitable. I never heard a word about why a good trial judge, and he is, we all make mistakes, that's why we have an appellate court, overlooked the significance of Dr. Kurth's testimony. Opposing counsel does the same thing. And he says, well, the lay witnesses were what we should listen to because they're objective. You can be objective, but you must be competent also to judge someone's dementia. And this is important because both the case law and the evidence before the court said that the less competent a person is mentally, the more difficulties they have cognitively, the more vulnerable they are to undue influence. And here we have a lady who, in fact, again, I was told, well, she wasn't in there three months. She was in there from November 2nd when she went into Proctor until she was released from St. Clair Nursing Home January 27th. If that's not three months, it's short a day or two, but that is a three-month period. Thank you. When we talk conceptually about a fair and equitable transaction, if you're not subject to undue influence, you don't have to have that transaction be fair and equitable, do you? I mean, do you have the right to? Well, actually, that is what the court found was that there was a presumption of undue influence. And that because of that presumption, it was incumbent upon the opponent to come forward and rebut that with clear and convincing evidence that the transaction was fair and equitable. This is in the court's order. This is a difficult, sad case. It's difficult to read about. It's difficult to think about. This is what this court is here to do, is to make things right between our citizens. A 93-year-old woman who'd been hospitalized for three months with an eighth-grade education, already suffering from dementia, should not be permitted to give away all of her income-producing property without even an attorney advising her that she can retain a life estate when it's obvious that she needs that income. We ask that this court reverse the judgment of the trial court for the reasons that there were, in fact, periods of five annual payments. Thank you. Great. Thank you, Ms. Kendall. Thank you, Mr. Rock. Also, thank you both for your arguments here today. This matter will be taken under advisement. The written disposition will be issued in due course.